UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION

EOG Resources, Inc.,                    )
                                        )       **AMENDED ORDER GRANTING**
            Plaintiff,                  )       **PLAINTIFF'S MOTION**
                                        )       **FOR SUMMARY JUDGMENT**
     vs.                                )       **(CLAIMS OF TED SEIDLER)**
                                        )
Badlands Power Fuels, LLC,              )
B.O.S. Roustabout & Backhoe Service, Inc., )    Case No. 4:08-cv-038
and Petroleum Experience, Inc.,         )
                                        )
            Defendants.                 )

---

Before the Court is the Plaintiff's motion for summary judgment filed on February 13, 2009.

See Docket No. 46. Defendant B.O.S. Roustabout & Backhoe Service filed a response in opposition

to the motion on February 19, 2009. See Docket No. 50. Defendant Badlands Power Fuels filed a

response in opposition to the motion on March 18, 2008. See Docket No. 51. The Plaintiff filed a

reply brief on April 1, 2009. See Docket No. 53. For the reasons set forth below, the Plaintiff's

motion for summary judgment is granted.


I.      **BACKGROUND**

        The plaintiff, EOG Resources, Inc. (EOG), is the owner and operator of the Zacher Oil Well

in Mountrail County, North Dakota. On the evening of May 26, 2007, EOG's contractors,

Petroleum Experience, Inc., B.O.S. Roustabout & Backhoe Service, Inc. (BOS), and Badlands

Power Fuels, LLC, were performing a flow back operation on the oil well. During this operation,

a fire occurred and injured Badlands Power Fuels employee Ted Seidler and BOS employees Tom

Grady and Calvin Grady.

Prior to May 26, 2007, EOG had entered into nearly identical master service contracts with

Petroleum Experience, BOS, and Badlands Power Fuels.  The agreements were in effect at the time

of the fire.  The agreements contain identical indemnity provisions, providing:

> 6A.  CONTRACTOR AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD COMPANY [EOG RESOURCES], ITS PARENT, SUBSIDIARY AND AFFILIATED COMPANIES AND ITS AND THEIR CO-LESSEES, PARTNERS, JOINT VENTURERS, CO-OWNERS, AGENTS, OFFICERS, DIRECTORS AND EMPLOYEES (HEREINAFTER COLLECTIVELY REFERRED TO AS "COMPANY GROUP") HARMLESS FROM AND AGAINST ALL DAMAGE, LOSS, LIABILITY, CLAIMS, DEMANDS AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER, INCLUDING COSTS OF LITIGATION, ATTORNEYS' FEES AND REASONABLE EXPENSES IN CONNECTION THEREWITH, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING BUT NOT LIMITED TO STRICT LIABILITY OR THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT, OR THE NEGLIGENCE OF ANY PARTY, INCLUDING BUT NOT LIMITED TO THE SOLE OR CONCURRENT NEGLIGENCE OF THE COMPANY GROUP, ARISING IN CONNECTION HEREWITH IN FAVOR OF CONTRACTOR'S AGENTS, INVITEES AND EMPLOYEES, AND CONTRACTOR'S SUBCONTRACTORS AND THEIR AGENTS, INVITEES AND EMPLOYEES ON ACCOUNT OF DAMAGE TO THEIR PROPERTY OR ON ACCOUNT OF BODILY INJURY OR DEATH.

> 6B.  COMPANY [EOG RESOURCES] AGREES TO PROTECT, DEFEND, INDEMNIFY AND HOLD CONTRACTOR, ITS AGENTS, OFFICERS, DIRECTORS AND EMPLOYEES (HEREINAFTER COLLECTIVELY REFERRED TO AS "CONTRACTOR GROUP") HARMLESS FROM AND AGAINST ALL DAMAGE, LOSS, LIABILITY, CLAIMS, DEMANDS AND CAUSES OF ACTION OF EVERY KIND AND CHARACTER, INCLUDING COSTS OF LITIGATION, ATTORNEYS' FEES AND REASONABLE EXPENSES IN CONNECTION THEREWITH, WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING BUT NOT LIMITED TO STRICT LIABILITY OR THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT, OR THE NEGLIGENCE OF ANY PARTY, INCLUDING BUT NOT LIMITED TO THE SOLE OR CONCURRENT NEGLIGENCE OF THE CONTRACTOR GROUP, ARISING IN CONNECTION HEREWITH IN FAVOR OF COMPANY'S [EOG RESOURCES'] AGENTS, INVITEES AND EMPLOYEES, COMPANY'S [EOG RESOURCES'] CONTRACTORS (OTHER THAN CONTRACTOR) AND THEIR AGENTS, INVITEES AND EMPLOYEES, AND SUCH CONTRACTORS' SUBCONTRACTORS, OR THEIR AGENTS, INVITEES OR EMPLOYEES ON

ACCOUNT OF DAMAGE TO THEIR PROPERTY OR ON ACCOUNT OF BODILY INJURY OR DEATH.

. . .

6E.  The terms and provisions of this Paragraph 6 shall have no application to claims or causes of action asserted against Company [EOG Resources] or Contractor by reason of any agreement of indemnity with a person or entity not a party to this Agreement in those instances where such contractual indemnities are not related to or ancillary to the performance of the work contemplated under the Agreement or are indemnities uncommon to the industry.  The terms and provisions of this Paragraph 6 shall expressly apply to claims or causes of action asserted against Company [EOG Resources] or Contractor by reason of any agreement of indemnity with a person or entity not a party to this Contract where such contractual indemnities are related to or ancillary to the performance of the work contemplated under the Agreement and or Company's [EOG Resources'] project and are indemnities not uncommon in the industry.

See Docket Nos. 20-2, 20-3, 20-4.

In these agreements, "Company" refers to EOG and "Contractor" refers to Petroleum Experience, BOS, or Badlands Power Fuels, respectively.  Pursuant to paragraphs 6A and 6B, the contractor agrees to indemnify EOG for any injuries or damages sustained by the contractor's employees, subcontractors, or invitees, and similarly EOG agrees to indemnify the contractor for any injuries or damages sustained by EOG's employees, contractors, contractors' subcontractors, or invitees.  Paragraph 6E extends the indemnity provisions of paragraphs 6A and 6B to actions filed by third parties who have entered into indemnity agreements with either EOG or the contractor when the indemnities are ancillary to the work contemplated under the master service contracts.  The master service contracts contain a provision which requires that the contracts be interpreted and construed under Texas law.[1]  See Docket Nos. 20-2, 20-3, 20-4.

---

[1]  Paragraph 19 of the master service contracts provides: "This Contract shall be construed and interpreted in accordance with the general maritime laws of the United States, where applicable, and where not applicable, the laws of the State of Texas shall apply, excluding any choice-of-law rule which would refer the matter to another

3

Badlands Power Fuels' employee Ted Seidler filed an action against Petroleum Experience, EOG, and BOS in state court in the District Court of Mountrail County.  BOS employees Tom Grady and Calvin Grady filed a separate action in state court against Petroleum Experience, EOG, and Badlands Power Fuels.

Petroleum Experience has tendered its defense to, and requested indemnification from, EOG under paragraph 6B of the master service contract for the claims Badlands Power Fuels employee Ted Seidler and BOS employees Tom Grady and Calvin Grady have filed against Petroleum Experience.  BOS has tendered its defense to, and requested indemnification from, EOG under paragraph 6B of the master service contract for the claims Badlands Power Fuels employee Ted Seidler has filed against it.

EOG has tendered its defense to, and requested indemnification from, Badlands Power Fuels under paragraph 6A of the master service contract for the claims Ted Seidler has made directly against it.  EOG also tendered the defense of, and requested indemnification for, the claims Petroleum Experience and BOS have made against EOG for the claims that Ted Seidler has made against them.

EOG has tendered its defense to, and requested indemnification from, BOS under paragraph 6A of the master service contract for the claims Tom Grady and Calvin Grady have made against EOG.  EOG has tendered the defense of, and requested indemnification for, the claims asserted against Petroleum Experience by Tom Grady and Calvin Grady and subsequently tendered to EOG under a separate master service contract to which BOS was not a party.

---

jurisdiction."

4

EOG filed this declaratory judgment action in federal district court, seeking a declaration of the rights and responsibilities of the parties under the master service contracts. See Docket Nos. 1 and 20. In its second motion for summary judgment, EOG contends that (1) on May 26, 2007, Badlands Power Fuels performed work for EOG under a verbal work order; and (2) the recital description of Badlands Power Fuels' business does not limit the scope of the master service contract. Badlands Power Fuels contends that (1) the master service contracts violate public policy because Exhibit A-1 of the agreement specifies the type and amount of insurance that Badlands Power Fuels, as the contractor, is required to provide, but there is no similar provision in the agreement specifying the amount or type of insurance that EOG is required to provide; (2) the master service contract is inapplicable to the services that Badlands Power Fuels employee Ted Seidler performed at the Zacher Oil Well on May 26, 2007, because Seidler's services were requested and directed by Paul Berger of Petroleum Experience, and not by EOG; and (3) the master service contract does not apply because Ted Seidler's services were not contemplated in the agreement. The parties incorporate by reference the briefs they have previously filed in this case.

II.    **LEGAL DISCUSSION**

The parties agree that the master service contracts are to be construed and interpreted under the Texas Oilfield Anti-Indemnity Act, codified at Tex. Civ. Prac. & Rem. Code §§ 127.001-007, and Texas case law. The Texas Oilfield Anti-Indemnity Act invalidates certain indemnity provisions in contracts pertaining to wells for oil, gas, or water, or to mines for other minerals. See Tex. Civ. Prac. & Rem. Code § 127.002. "As a general rule, the Texas Oilfield Anti-Indemnity Act

5

voids indemnity provisions . . . that purport to indemnify a party against liability caused by the indemnitee's sole or concurrent negligence and arising from personal injury, death, or property damage." <u>Green's Pressure Testing & Rentals, Inc. v. Flournoy Drilling Co.</u>, 113 F.3d 47, 50 (5th Cir. 1997); <u>see also</u> Tex. Civ. Prac. & Rem. Code § 127.003.[2]  The Act provides for an exception that permits indemnity provisions when the parties agree in writing that the provisions are supported by liability insurance.  <u>See</u> Tex. Civ. Prac. & Rem. Code § 127.005(a).  Section 127.005 of the Texas Oilfield Anti-Indemnity Act provides:

> (a)　　This chapter does not apply to an agreement that provides for indemnity if the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor subject to the limitations specified in Subsection (b) or (c).

> (b)　　With respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to obtain for the benefit of the other party as indemnitee.

> (c)　　With respect to a unilateral indemnity obligation, the amount of insurance required may not exceed $500,000.

Tex. Civ. Prac. & Rem. Code § 127.005.

---

[2] Section 127.003 of the Texas Oilfield Anti-Indemnity Act provides:

(a)　　Except as otherwise provided by this chapter, a covenant, promise, agreement, or understanding contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral is void if it purports to indemnify a person against loss or liability for damage that:

　　(1)　　is caused by or results from the sole or concurrent negligence of the indemnitee, his agent or employee, or an individual contractor directly responsible to the indemnitee; and

　　(2)　　arises from:

　　　　(A)　　personal injury or death;

　　　　(B)　　property injury; or

　　　　(C)　　any other loss, damage, or expense that arises from personal injury, death, or property injury.

A.    **PUBLIC POLICY**

Badlands Power Fuels contends the master service contracts are in violation of the Texas Oilfield Anti-Indemnity Act because the agreements describe the type of insurance coverage and the dollar limits that the contractor is required to maintain, but do not specify the type or amount of insurance that EOG is required to maintain.  Paragraph 7 of the master service contracts provides that the contractor is required to maintain insurance of such types and amounts as are described in Exhibit A-1.  Pursuant to Exhibit A-1, Petroleum Experience, BOS, and Badlands Power Fuels, as the contractors, are required to purchase $1,000,000 of comprehensive general liability insurance. Exhibit A-1 also requires the contractors to purchase worker's compensation and employers' liability insurance, comprehensive automobile insurance, aircraft liability insurance, and physical damage insurance.  The only provision that requires EOG to maintain insurance is paragraph 6D which provides:  "The parties agree that the indemnities provided for by Company and Contractor under this Agreement shall be supported either by available insurance or voluntarily self-insured, in whole or part."  See Docket Nos. 20-2, 20-3, 20-4.

Badlands Power Fuels contends:

> At no time has EOG provided any evidence of insurance in favor of Badlands of the same type Badlands was required to maintain, to-wit:  (1) Worker's Compensation and Employers' Liability Insurance; (2) Comprehensive General Liability Insurance; (3) Comprehensive Automobile Insurance; (4) Aircraft Liability Insurance; and (5) Physical Damage Insurance.  Indeed the affidavit from EOG's risk manager does not evince a Commercial General Liability policy or any of the additional coverages Badlands is required to maintain under Exhibit "A-1" of the [master service contract].  Despite the affidavit of the risk manager, EOG has not agreed to provide the same "extent of coverage and dollar limits of insurance or qualified self-insurance" that Badlands has agreed to provide.  The [master service contract] contains a one-sided obligation on the part of Badlands and is not a mutual indemnity obligation supported by insurance as required by the [Texas Oilfield Anti-Indemnity Act].

See Docket No. 51. In the Court's order dated June 9, 2009, the Court determined that paragraphs 6A and 6B of the master service contracts contain a mutual indemnity obligation for the contracting parties to hold each other "harmless from and against all damage, loss, liability, claims, demands and causes of action of every kind and character, including costs of litigation, attorneys' fees and reasonable expenses in connection therewith, without limit and without regard to the cause or causes thereof." See Docket Nos. 20-2, 20-3, 20-4.

Pursuant to Section 127.005(b) of the Texas Oilfield Anti-Indemnity Act, the mutual indemnity obligation of paragraphs 6A and 6B is enforceable up to the extent of coverage and dollar limits of insurance that each party maintains. The Court determined that EOG provided evidence that it had maintained insurance in an amount of $1,000,000 for tort liability resulting in bodily injury or property damage to a third person or organization. The insurance is equivalent to comprehensive general liability insurance which the contractors are required to maintain in the amount of $1,000,000 pursuant to Exhibit A-1.

The Court found that EOG had not provided any evidence that it had maintained worker's compensation and employers' liability insurance, comprehensive automobile insurance, aircraft liability insurance, or physical damage insurance. If EOG had maintained insurance other than general liability insurance, and if such insurance is relevant to the lawsuit, then the mutual indemnity obligation of paragraphs 6A and 6B is enforceable up to the types of insurance that both the contractor and EOG provided, and up to the dollar amount that they provided.

The master service contracts do not violate the Texas Oilfield Anti-Indemnity Act by requiring the contractors to provide insurance in specified types and amounts without placing the same burden on EOG. Texas case law is clear that agreements pertaining to oil well drilling do not

violate the Texas Oilfield Anti-Indemnity Act if the parties agree to maintain a different dollar amount or extent of insurance.  See Ken Petroleum Corp. v. Questor Drilling Corp., 24 S.W.3d 344, 351 (Tex. 2000) ("When the parties agree to provide differing amounts of coverage, the mutual indemnity obligations are limited to the lower amount of insurance.  The amount of coverage each party agrees to provide need not be specified in the agreement that contains the indemnity agreement." ); Ranger Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 78 S.W.3d 659, 663 (Tex. App. 2002) (finding that the indemnity obligation is limited to the lowest common denominator of insurance coverage that both parties agreed to provide).  Therefore, Texas case law has clearly established that the parties to an agreement relating to an oil well may agree to provide different types and amounts of insurance coverage without violating the Texas Oilfield Anti-Indemnity Act, but the mutual indemnity obligation in the agreement is enforceable only up to the extent of the insurance coverage and the dollar limit that both parties agreed to provide in equal amounts. Accordingly, the master service contracts do not violate the Texas Oilfield Anti-Indemnity Act by requiring Petroleum Experience, BOS, and Badlands Power Fuels, as the contractors, to maintain in specified amounts of coverage worker's compensation and employers' liability insurance, comprehensive general liability insurance, comprehensive automobile insurance, aircraft liability insurance, and physical damage insurance, without specifying the types and amounts of coverage that EOG is required to maintain.

In this case, Petroleum Experience, BOS, and Badlands Power Fuels, as the contractors, agreed that the mutual indemnity obligation would be supported by various types of  insurance, including $1,000,000 in general liability insurance.  EOG contractually agreed in writing that its indemnity obligation "shall be supported either by available insurance or voluntarily self-insured,

in whole or part" See Docket Nos. 20-2, 20-3, 20-4.  The master service contracts do not provide any limits on the type or amount of insurance that EOG was required to maintain.  Therefore, the only limits on EOG's obligation to provide insurance comes from the Texas Oilfield Anti-Indemnity Act.  Under Section 127.005 of the Texas Oilfield Anti-Indemnity Act, EOG's obligation as to general liability insurance is statutorily limited to a maximum of $1,000,000.  It was for the contractors' protection that their insurance liability was spelled out in the agreement.  That way, the mutual indemnity obligation was enforceable only up to the types of insurance coverage and the dollar amounts that the contractors agreed to provide.  The evidence reveals that EOG did, in fact, support the indemnity obligation with $1,000,000 in general liability insurance for personal injury and property damage.  Accordingly, the mutual indemnity obligation is enforceable for tort liability resulting from personal injury and property damage in the amount of $1,000,000 per occurrence.

### B.    VERBAL WORK ORDER

EOG contends that Badlands Power Fuels employee Ted Seidler performed work at the Zacher Oil Well on May 26, 2007, under a verbal work order and, therefore, the master service contract between EOG and Badlands Power Fuels applies.  Badlands Power Fuels argues that the master service contract with EOG does not apply because Paul Berger of Petroleum Experience initiated the work order, Berger directed the contractors, Berger had the right to control operations at the Zacher Oil Well, and no EOG employees were present on the well site.  As a result, Badlands Power Fuels contends that its employee, Ted Seidler, performed services at the Zacher Oil Well at the request and direction of Berger, not EOG.

Petroleum Experience entered into the master service contract with EOG to provide well site supervision services.  <u>See</u> Docket No. 40, p. 235.  Paul Berger is an oilfield consultant who is employed by Petroleum Experience but has worked for EOG since June 2004 supervising workovers and completions on oil wells.  <u>See</u> Docket No. 40, p. 10.  EOG paid Petroleum Experience $860 per day for sending Berger to the Zacher Oil Well to supervise drilling operations.  <u>See</u> Docket No. 40, p. 235.  Petroleum Experience paid Berger roughly $686 per day for his services on the Zacher Oil Well.  <u>See</u> Docket No. 40, p. 236.  David Pete Peterson is the owner and president of Petroleum Experience.  While working on the Zacher Oil Well, Berger did not report to his boss, David Pete Peterson, but rather reported to C.B. Lackey, an engineer for EOG who was the production manager for the well.  <u>See</u> Docket No. 40, pp. 197-98, 234.  Berger reported to Lackey daily, and sometimes as many as three to four times a day:

|  |  |
|---|---|
| Q.  [Counsel for Franz Construction]: | And that's what I was wondering. Why – why would you be calling him three or four times a day? |
| A.  [Berger]: | He's an engineer.  He likes to know everything that's going on.  I mean, he supervises – he's in charge of the operation, and it – if we're working on a well, if we have a problem, then I call him and we discuss what we want to do next. |
| . . . | |
| Q.  [Counsel for Franz Construction]: | Is he giving you directions on what to do or are you just reporting to him? |
| A.  [Berger]: | I report to him and depends on the circumstances.  Sometimes he gives me directions and sometimes we just discuss what we're doing. |

<u>See</u> Docket No. 40, pp. 198-99.

On May 26, 2007, Badlands Power Fuels employee Ted Seidler assisted in a flow back operation at the Zacher Oil Well. To perform the flow back operation, Ted Seidler used a Badlands Power Fuels truck to pump water out of a flat tank into large storage tanks. A verbal work order was issued by Berger for Badlands Power Fuels to work at the Zacher Oil Well:

| | |
|---|---|
| Q. [Counsel for Badlands Power Fuels]: | How was [Badlands] Power Fuels arranged to be at the site? |
| A. [Berger]: | I called them. |
| Q. [Counsel for Badlands Power Fuels]: | It was an oral work order given by you? |
| A. [Berger]: | Yes. |

See Docket No. 40, p. 211. Mark Johnsrud, the owner of Badlands Power Fuels, acknowledged that Badlands Power Fuels received verbal work orders directly from EOG employees, or from Paul Berger and Lynn Gravos of Petroleum Experience, to work for EOG. See Docket No. 48-8, pp. 20-21. Approximately ninety-nine percent of the work orders that Badlands Power Fuels receives are verbal. See Docket No. 48-8, pp. 27-28.

Berger directed and supervised the flow back operation at the Zacher Oil Well on May 26, 2007. Mark Johnsrud, the owner of Badlands Power Fuels, stated that it is common practice for there to be a drilling supervisor onsite to direct the operations at an oil well:

| | |
|---|---|
| Q. [Counsel for Ted Seidler]: | Okay. |
| A. [Johnsrud]: | And then – and typically how that works is that there will be a drilling supervisor. That drilling supervisor – then the other consultants that operate the rigs report to him or through him. If everything goes well, you probably won't – you know, you'll just work with those guys. If there's any |

> problems or you, you know, put something in the wrong tank or make an error, you'll probably hear from the drilling supervisor.

See Docket No. 48-8, p. 43.  Despite Berger having the authority to direct and supervise the other consultants at the well site, the flow back operation was performed for the benefit of EOG:

| | |
|---|---|
| Q. [Counsel for EOG]: | So then you were doing work that was actually benefitting EOG while you were out there? |
| A. [Seidler]: | I would – well, it's part of their process of getting the well driller, I mean, or set up for production. |
| Q. [Counsel for EOG]: | So that statement would be true? |
| A. [Seidler]: | True. |
| Q. [Counsel for EOG]: | That the work you were doing would be for the benefit of EOG? |
| A. [Seidler]: | Yeah. |
| Q. [Counsel for EOG]: | So the work you were doing was in essence for EOG; correct? |
| A. [Seidler]: | Right, yes. |

See Docket No. 48-10, p. 153.  Badlands Power Fuels was paid by EOG for its services at the Zacher Oil Well, and Mark Johnsrud considered EOG to be Badlands Power Fuels' customer:

| | |
|---|---|
| Q. [Counsel for Ted Seidler]: | And when you get paid, does the check come from EOG? |
| A. [Johnsrud]: | Yes, it does. |

. . .

13

| Q.  [Counsel for Ted Seidler]: | Now, I realize that the exhibits here show that EOG was the customer. Did you consider them to be your customer? |
|---|---|
| A.  [Johnsrud]: | Absolutely. And they're the ones that have the ultimate control whether or not we work for them or not, because we've – you know, we've had to meet their management out of Denver, and that's who, you know, we consider to be the responsible parties, and they kind of decide and determine whether or not we're engaged to work for them or not. |

See Docket No. 48-8, pp. 41, 43.

The services Ted Seidler performed at the Zacher Oil Well on May 26, 2007, were never billed to EOG because the work was only partially completed before the fire occurred. See Docket No. 48-8, pp. 22-23. If the operation on May 26, 2007, would have occurred without incident, Badlands Power Fuels would have completed an invoice for Ted Seidler's services, submitted the invoice to Paul Berger for approval, and then sent the invoice to EOG for payment. See Docket No. 48-8, pp. 23-25.

The Court finds that Petroleum Experience has contracted with EOG since 2004 to supervise the operations of EOG's oil wells. Johnsrud's deposition testimony reveals that it is common in North Dakota for a drilling supervisor to be present at an oil well site to direct and control the operations. In this case, Paul Berger, an employee of Petroleum Experience, was the well site supervisor who was hired by EOG to direct the operations at the Zacher Oil Well. EOG pays Petroleum Experience for Berger's services and Petroleum Experience pays Berger directly for his work. As the well site supervisor, Berger was responsible for making instant decisions such as

14

whether to continue operations based on the wind conditions and equipment failure, whether to use specific equipment at the well site, and where to safely position the equipment.  See Docket No. 40, pp. 27, 246-50.  Berger arranged to rent the equipment, but EOG paid the rental dues.  See Docket No. 40, p. 27.  Even though Berger, as the well site supervisor, had the right to make immediate decisions, EOG ultimately controlled the operations performed at the Zacher Oil Well.  It is undisputed that C.B. Lackey of EOG oversaw the general operation of the Zacher Oil Well.

More important, the owner and president of Badlands Power Fuels, Mark Johnsrud, acknowledged that Badlands Power Fuels was performing services at the Zacher Oil Well for EOG, not Petroleum Experience.  Badlands Power Fuels employee Ted Seidler also acknowledged that on May 26, 2007, he was performing services at the well site for EOG.  Accordingly, the Court finds that Badlands Power Fuels was hired by EOG to work at the Zacher Oil Well when needed, and that Badlands Power Fuels was notified that its services were needed by verbal work orders from EOG employees, or from Petroleum Experience employees Paul Berger and Lynn Gravos.

## C.      RECITAL DESCRIPTION

EOG contends that the recital description of Badlands Power Fuels' business in the master service contract does not limit the scope of the agreement.  Badlands Power Fuels argues, "In executing the [master service contract] between EOG and Badlands, it was expressly contemplated that Badlands would be engaged in the business of 'Transportation of Liquids (sic) in Bulk & Vac Trucks."  See Docket No. 51 (quoting its master service contract with EOG).  Badlands Power Fuels contends that its employee, Ted Seidler, was pumping fluids at the Zacher Oil Well on May 26,

2007, and therefore, the services performed by Ted Seidler were not contemplated in the master service contract.

> The master service contract contains a recital that reads as follows:

> WHEREAS, Contractor [Badlands Power Fuels] is a service contractor <u>engaged in the business of</u> Transportation of Liqueds in Bulk & Vac Trucks and desires to perform <u>work</u> as an independent contractor for the Company [EOG] from time to time[.]"

<u>See</u> Docket No. 20-2 (emphasis added) (error in original).  The recital is a mere description of Badlands Power Fuels' business, and does not contain operative language as to the specific type of work contemplated under the agreement.  The operative language governing the scope of the agreement is found in paragraph 1 which provides:

> This Agreement shall control and govern all work performed by Contractor for the Company, under subsequent verbal and/or regular work orders, and any agreements or stipulations in any such work order, delivery ticket, or other instrument used by Contractor not in conformity with the terms and provisions hereof shall be null and void.

<u>See</u> Docket No. 20-2.

"Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense."  <u>Certain Underwriters at Lloyd's Subscribing to Policy No. WDO-10000 v. KKM Inc.</u>, 215 S.W.3d 486, 492 (Tex. App. 2006).  "Although recitals to a contract generally will not control a contract's operative clauses, unless those clauses are ambiguous, the recitals may be looked to in determining the proper construction of the contract and the parties' intent."  <u>Quick v. Plastic Solutions of Texas, Inc.</u> 270 S.W.3d 173, 183 n. 4 (Tex. App. 2008).  "Recitals in a contract should be reconciled with the operative clauses, and given effect, so far as possible; but where the recital is so inconsistent with the covenant or promise that they cannot be harmonized, the latter, if unambiguous, prevails."

Gardner v. Smith, 168 S.W.2d 278, 280 (Tex. App. 1942).  "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered."  Royal Maccabees Life Ins. Co. v. James, 146 S.W.3d 340, 346 (Tex. App. 2004).  "A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation.  A contract is not ambiguous if its words can be given a definite or certain meaning as a matter of law."  Burlington N. and Santa Fe Ry. Co. v. S. Plains Switching Co., 174 S.W.3d 348, 356 (Tex. App. 2005) (citing Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)).  A contract which is unambiguous must be construed by the court as a matter of law and not left open to the interpretation of its terms by a jury.  Burlington N. and Santa Fe Ry. Co., 174 S.W.3d at 356.

The term "work" is not defined in the master service contract.  The Oxford English Dictionary defines "work" as "[s]omething that is or was done; what a person does or did; an act, deed, proceeding, business."  The Oxford English Dictionary (2d ed. 1989).  Applying the plain meaning of "work" to paragraph 1, the agreement governs all acts or deeds that Badlands Power Fuels performs for EOG.  The Court finds that the operative language of paragraph 1 is clear and unambiguous.  The agreement unambiguously governs "all work performed by Contractor for the Company . . . ."  All means all.

In addition, the recital can be harmonized with paragraph 1.  The recital indicates that Badlands Power Fuels "desires to perform work as an independent contractor for" EOG.  See Docket No. 20-2.  The recital clarifies that Badlands Power Fuels is engaged in the business of "Transportation of Liqueds in Bulk & Vac Trucks."  See Docket No. 20-2 (error in original).  The

recital does not define "work," nor does it provide any limitations on what constitutes work. The recital merely provides a description of Badlands Power Fuels' business. Accordingly, the Court finds that the language of the recital is neither inconsistent with, nor does it contradict, paragraph 1.

Having determined that the master service contract is unambiguous in that it governs all work performed by Badlands Power Fuels for EOG, the Court must determine whether the agreement applies to Badlands Power Fuels for the services that its employee Ted Seidler performed on the Zacher Oil Well on May 26, 2007. Pursuant to paragraph 1, the master service contract applies when (1) Badlands Power Fuels performs services which constitute "work," and (2) the work was performed for EOG.

Badlands Power Fuels is primarily in the business of bulk transportation of crude oil, freshwater, saltwater, and other drilling fluids for oil companies. See Docket No. 48-8, p. 7. On May 26, 2007, Badlands Power Fuels employee Ted Seidler assisted in a flow back operation at the Zacher Oil Well using a Badlands Power Fuels truck to pump fluids from a flow back tank to an upright tank. See Docket No. 48-8, pp. 13-14, 26. Badlands Power Fuels has assisted other oil companies in transferring fluids from one tank to another at oil well sites as part of its services. See Docket No. 48-8, pp. 13-14. The services that Ted Seidler performed at the oil well benefitted EOG. See Docket No. 48-8, p. 26. If the services would have been performed without incident, Badlands Power Fuels would have billed EOG. See Docket No. 48-8, pp. 26-27. In addition, owner and president Mark Johnsrud considered EOG to be the customer for the services that Badlands Power Fuels employee Ted Seidler performed at the Zacher Oil Well:

18

Q.  [Counsel for Ted Seidler]:          Now, I realize that the exhibits here
                                        show that EOG was the customer.
                                        Did you consider them to be your
                                        customer?

A.  [Johnsrud]:                         Absolutely.  And they're the ones that
                                        have the ultimate control whether or
                                        not we work for them or not, because
                                        we've – you know, we've had to meet
                                        their management out of Denver, and
                                        that's who, you know, we consider to
                                        be the responsible parties, and they
                                        kind of decide and determine whether
                                        or not we're engaged to work for them
                                        or not.

See Docket No. 48-8, p. 43.

The evidence reveals that Badlands Power Fuels employee Ted Seidler assisted in a flow back operation at the Zacher Oil Well on May 26, 2007.  Ted Seidler used a Badlands Power Fuels truck to pump fluids from a flow back tank into upright tanks.  The Court finds that the services which Ted Seidler performed at the Zacher Oil Well constitute "work."  In addition, the deposition testimony of Mark Johnsrud clearly demonstrates that the services which Ted Seidler performed at the Zacher Oil Well on May 26, 2007, were performed for EOG.  Mark Johnsrud admitted that the flow back operation benefitted EOG and that EOG was Badlands Power Fuels' customer.  Accordingly, the Court finds that the master service contract is applicable to the services that Badlands Power Fuels employee Ted Seidler performed at the Zacher Oil Well on May 26, 2007.

**III.**    **CONCLUSION**

The Court finds that the mutual indemnity obligation of paragraphs 6A and 6B of the master service contract between EOG and Badlands Power Fuels is enforceable up to the types of insurance that both Badlands Power Fuels and EOG provided, and up to the dollar amount that the parties equally provided.  The Court also finds that Badlands Power Fuels received a verbal work order from Paul Berger to perform services at the Zacher Oil Well on May 26, 2007, and that it is within the ordinary course of business for Badlands Power Fuels to receive verbal work orders from Berger for work being performed for EOG.  In addition, the Court finds that the master service contract is applicable to the services that Badlands Power Fuels employee Ted Seidler performed at the Zacher Oil Well on May 26, 2007.

Accordingly, the Court finds that Badlands Power Fuels must defend and indemnify EOG pursuant to paragraph 6A of its master service contract, with the indemnity obligation limited to a maximum of $1,000,000 per occurrence, from the claim its employee, Ted Seidler, has made directly against EOG.  Badlands Power Fuels must also defend and indemnify EOG under paragraph 6E of its master service contract from the claims that Petroleum Experience and BOS have made against EOG for the claims that Ted Seidler has made against them.  The Court also finds that any obligation EOG has to indemnify Petroleum Experience, Inc. and B.O.S. Roustabout & Backhoe Service, Inc., under paragraph 6B of the master service contract is limited to a maximum of $1,000,000 per occurrence.

For the reasons set forth above, EOG Resources' motion for summary judgment  (Docket No. 46) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 11th day of December, 2009.

/s/  Daniel L. Hovland
Daniel L. Hovland, District Judge
United States District Court

21